**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

MARCOS PEREZ-TREVINO,

        Defendant.

No. 15-CR-2037-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.    **INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.   **RELEVANT PROCEDURAL BACKGROUND**. . . . . . . . . . . . . . . . . . . . **2**

III.  **RELEVANT TRIAL EVIDENCE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

    A.  *Organization of Drug Distribution Conspiracies in General*. . . . . . . . . . *2*
    B.  *Summary of the Organization of the Conspiracy*. . . . . . . . . . . . . . . . *3*
    C.  *April 2014 Arrest*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
    D.  *Involvement with Jacket and August 2014 Interview*. . . . . . . . . . . . . . *5*
    E.  *Involvement with Victor and February 2015 Arrest*. . . . . . . . . . . . . . . *6*
    F.  *Involvement with Acosta Ceniceros and March 2015 Interdiction*. . . . . . . *7*
    G.  *Involvement with Guadarrama, April 2015 Controlled Buy and May/June 2015 Arrests*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
    H.  *August 2015 Interdiction in Oklahoma*. . . . . . . . . . . . . . . . . . . . . . *9*

IV.  **MOTION FOR JUDGMENT OF ACQUITTAL**. . . . . . . . . . . . . . . . . . **10**
    A.  *Legal Standard*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
    B.  *Analysis*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
    C.  *Agreement to Join Conspiracy*. . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
    D.  *Knowledge of Conspiracy and of Co-Conspirators*. . . . . . . . . . . . . . . **15**
    E.  *Summary of Defendant's Activities*. . . . . . . . . . . . . . . . . . . . . . . . **17**

V.   **MOTION FOR NEW TRIAL**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

    A.  *Legal Standard*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
    B.  *Analysis*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

VI.  **CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

# I.  INTRODUCTION

The matter before the court is Defendant Marcos Perez-Trevino's "Motion . . . for Judgment of Acquittal and Motion for New Trial" ("Motion") (docket no. 437).

# II.  RELEVANT PROCEDURAL BACKGROUND

On August 26, 2015, a grand jury returned an Indictment (docket no. 12) charging Defendant with conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), 846.

On August 9, 2016, a jury trial commenced.  *See* August 9, 2016 Minute Entry (docket no. 391).  On August 12, 2016, Defendant moved for a judgment of acquittal at the close of the government's evidence.  *See* August 12, 2016 Minute Entry (docket no. 400).  The court denied the motion.  *See id.*  On August 15, 2016, Defendant renewed the motion for judgment of acquittal at the close of all evidence.  *See* August 15, 2016 Minute Entry (docket no. 404).  The court denied the motion.  *See id.*  On August 16, 2016, the jury returned a verdict finding Defendant guilty of the crime alleged in the Indictment.  *See* Jury Verdict (docket no. 412).

On August 30, 2016, Defendant filed the Motion.  On September 8, 2016, the government filed a Resistance (docket no. 441).  Defendant has requested a hearing on the Motion, but the court finds a hearing unnecessary.  The Motion is fully submitted and ready for decision.

# III.  RELEVANT TRIAL EVIDENCE

Viewed in the light most favorable to the verdict, the evidence at trial was as follows.

## A. Organization of Drug Distribution Conspiracies in General

Special Agent Kelly Meggers of the Iowa Division of Narcotics Enforcement testified that modern drug distribution organizations include roles beyond large-quantity distributors and small-quantity dealers.  Meggers testified that members of a drug

conspiracy may also broker drug transactions, drive vehicles to transport shipments of drugs and operate "stash houses" where drugs and money are stored. Meggers testified that drug conspiracies are structured like a wheel, with the various facilitating roles (low-level dealers, drivers, etc.) at the center of the wheel and high-level distributors on the outside that make the wheel go around. Special Agent Meggers also testified that the street-level dealers and facilitators in the middle of the "wheel" rely on multiple sources of drugs to maintain a continual supply for their customers and create business at all levels of the wheel. Meggers testified that drug distribution conspiracies can evolve so that smaller dealers and facilitators in the middle of the wheel can graduate to becoming multi-pound level dealers, where they begin to supply other dealers. Meggers also testified that co-conspirators will attempt to insulate themselves from detection by having other co-conspirators drive them places and by having the titles of vehicles in other people's names, as well as utilizing stash houses where drugs and money can be kept safe.

## B. Summary of the Organization of the Conspiracy

The conspiracy at issue centered on the distribution of methamphetamine and ice methamphetamine in the Marshalltown, Iowa area. It involved numerous distributors and dealers and resulted in multi-defendant criminal prosecutions in the Northern District of Iowa.

In a prosecution related to the instant prosecution, defendants were charged with conspiring to distribute methamphetamine beginning approximately in the spring of 2013 and continuing until approximately May 2015. The conspirators charged were Mario Murillo Mora, Austin Bertch, Jessica Acosta Ceniceros, Vania Guadarrama, Gustavo Gonzalez-Torres, Rachel Berrones, Jeff Richardson, Jason Gauthier, Ragan Victor and Rafael Avalos-Castellanos. All of these defendants pled guilty.

In the instant prosecution, the indictment charged a conspiracy to distribute methamphetamine beginning approximately in the spring of 2013 and continuing until

approximately August 2015. The conspirators charged were Defendant Marcos Perez Trevino, Donita Urban, Scott Mathews, Daniela Castellanos, Brian Swartz, Rogelio Avalos-Sanchez, Jennifer Mares-Flores, Miguel Mendoza, Alvaro Hernandez, Frances Gasca and Alejandro Becerra. Except for Defendant Marcos Perez Trevino, Castellanos and Becerra, who were tried together and were convicted, all of these defendants pled guilty.

At trial, seventeen different witnesses testified as to the activities of the conspiracy. Witnesses included co-conspirators Berrones, Victor, Avalos-Sanchez, Guadarrama, Gasca and Acosta Ceniceros. Derrick Plunkett, who was connected to the conspiracy and was convicted in an unrelated prosecution of conspiracy to distribute methamphetamine in the Waterloo, Iowa area, also testified. The evidence confirmed Special Agent Meggers's characterization of the modern drug conspiracy as a complex and ever-evolving wheel of actors.

Regarding the evidence against Defendant, testimony at trial demonstrated that he had direct drug-related dealings with multiple defendants. Defendant first became connected to this conspiracy through, among others, Victor, who bought methamphetamine from an associate of Defendant. Victor also sold methamphetamine for Murillo Mora. Murillo Mora supplied pound-level amounts of methamphetamine to the various street-level dealers at the hub of the conspiracy, including Victor, Guadarrama and Acosta Ceniceros. Murillo Mora was eventually joined by Becerra and Defendant as higher-level sources of supply for the conspiracy, and each would supply the other's customers when they lacked methamphetamine to supply. Throughout the relevant timeframe, Defendant was regularly intercepted by police while in possession of pre-packaged, ready to sell baggies of methamphetamine. He was ultimately caught with almost a kilogram of methamphetamine in his car, which he admitted to investigators that he intended to sell in Iowa.

### C. April 2014 Arrest

Officer Dane Bowermaster of the Marshalltown Police Department testified that, on April 14, 2014, he responded to an assistance call from another officer who had arrested Defendant. Bowermaster and his fellow officer recovered over six grams of methamphetamine from Defendant at the time of his arrest, packaged in separate baggies for distribution, along with $550 in cash. Bowermaster testified that a "user amount" of methamphetamine is approximately one gram. Acosta Ceniceros testified that a user amount in her experience is approximately one-fifth of a gram and that she herself had developed a gram-a-day habit by smoking throughout the day. Special Agent Meggers testified that a "dosage unit" depends on the individual drug user but, for methamphetamine, the dosage amount is typically 0.25 to 1 gram. As a result, according to Officer Bowermaster and Special Agent Meggers, users usually possess about a gram of methamphetamine at a time. Laboratory testing determined that Defendant was in possession of 6.29 grams of methamphetamine, with a purity of 75.06%. Meggers testified that the amount found in Defendant's possession is consistent with redistribution and that packaging methamphetamine into separate baggies is consistent with dealing to other dealers or users.

### D. Involvement with Jacket and August 2014 Interview

Sergeant James Gibson of the Marshall County Sheriff's Office testified that he became aware of Defendant after he was arrested in the summer of 2014. He interviewed Defendant on August 29, 2014 at the suggestion of the County Attorney. In the interview, Defendant asserted that he was not a user of drugs, discussed his involvement in the distribution of methamphetamine and informed Gibson of two methamphetamine suppliers named "Rojas" and Javier "El Bote" Ordez Sanchez. Defendant also stated that he used

to be a driver[1] for someone he referred to as "Jacket" and that Jacket was involved in methamphetamine distribution. Defendant told Gibson that, as Jacket's driver, he would take Jacket to Rojas and pick up approximately half to one pound quantities of methamphetamine. Defendant suggested that, in addition to the distributors and suppliers in Marshalltown, Iowa, he also worked with people in Waterloo, Iowa. Gibson testified that Jacket was arrested at Victor and Avalos-Castellanos's house in the months prior to his interview with Defendant. Defendant was released from custody after his interview with Gibson.

### E. Involvement with Victor and February 2015 Arrest

Victor testified that Jacket previously lived in, and dealt methamphetamine from, the basement of her home. Victor observed Defendant and Jacket in her house using and dealing drugs. Victor testified that, after she enlisted the police's help to have Jacket arrested and taken out of her house, Defendant sold her user amounts of methamphetamine (approximately one gram at a time) on about ten occasions. Castellanos moved into Victor's house shortly after Jacket's arrest. Castellanos introduced Victor to Murillo Mora as a source of supply of methamphetamine other than Defendant. Victor testified that she subsequently sold methamphetamine for Murillo Mora. Victor also testified that her boyfriend Avalos-Castellanos sold her Pontiac to Defendant for an undisclosed cash amount and that Avalos-Castellanos purchased methamphetamine from Defendant on her behalf.

Officer Bowermaster had further interactions with Defendant on February 7, 2015, when he arrested Defendant for driving without a license. Incident to this arrest,

---

[1] Sergeant Gibson testified that drug dealers often employ drivers to insulate themselves from law enforcement and to protect them in potentially dangerous situations, which might include getting "jacked" by buyers and having their drugs stolen.

Defendant was found to be carrying two small baggies of methamphetamine, totaling approximately one gram.

Wiretaps targeting Murillo Mora confirmed that Defendant had cellphone contact with Murillo Mora and Acosta Ceniceros around this time. Special Agent Meggers testified that, between February 2 and February 5, 2015, Defendant had cell phone contact with Acosta Ceniceros on nine separate occasions. Defendant also had cell phone contact with Murillo Mora on nine separate occasions on February 25, 2015.

### F. Involvement with Acosta Ceniceros and March 2015 Interdiction

Acosta Ceniceros testified that she began working for Murillo Mora in January of 2015. She was given half a pound of methamphetamine, a cellphone full of clients' numbers and instructions to sell the methamphetamine for a total of $6,000. Acosta Ceniceros failed in her task because she was robbed by a customer. She then attempted to find another source of methamphetamine to continue dealing, and Defendant agreed to supply her. Acosta Ceniceros and Defendant became "friends" on Facebook, with Castellanos being a "mutual friend." Defendant first "fronted" (supplied on credit) an ounce of methamphetamine for Acosta Ceniceros to sell, but not before ensuring that Acosta Ceniceros was not wearing a wire. Acosta Ceniceros sold the ounce for Defendant and subsequently graduated to selling quarter-pound amounts for him. At one point, Defendant told Acosta Ceniceros to meet two people from Iowa City, Iowa at a Wal-Mart so they could store two pounds of Defendant's methamphetamine in her garage, out of a total load of eight pounds. Acosta Ceniceros saw for herself the weight of the methamphetamine, because it was weighed in front of her. In exchange for storing the two pounds, Defendant allowed Acosta Ceniceros to keep a quarter pound of the methamphetamine to sell herself. She testified that she received around two pounds total from Defendant to sell between March and May of 2015.

The government also presented text messages between Acosta Ceniceros and Defendant, and in one of the messages Defendant offered to sell a pound of methamphetamine to Acosta Ceniceros for $12,000. Acosta Ceniceros testified that she had no other relationship with Defendant other than his relationship as her drug supplier and that the drugs she received from Defendant were pure ice methamphetamine. She also testified that, when Defendant ran out of methamphetamine to supply, she would obtain methamphetamine from Becerra instead.

### G. Involvement with Guadarrama, April 2015 Controlled Buy and May/June 2015 Arrests

Law enforcement set up a controlled buy of methamphetamine from Defendant on April 22, 2015. Defendant arrived at the drug buy in a red Pontiac Grand Prix registered to "Ragan Kirk," an alias of Ragan Victor. The confidential informant ("CI") entered the red Grand Prix and obtained methamphetamine from Defendant. The CI informed law enforcement that they had also previously bought methamphetamine from Guadarrama. Guadarrama testified that, as Defendant had done, she used El Bote as a source of supply for methamphetamine before he was deported to Mexico. On one occasion, after Bote had fronted Guadarrama some methamphetamine, Defendant attempted to collect on the undischarged debt by contacting Guadarrama at her residence. At some point, Defendant supplied Guadarrama with an "8-ball" of methamphetamine (approximately 3.5 grams).

Officer Bowermaster testified that, on May 7, 2015, he again arrested Defendant for driving without a license. During an inventory search of Defendant's vehicle, trace amounts of methamphetamine were found on the carpet and on a folded-up dollar bill. This finding was confirmed by laboratory testing. A scale was found in the glove compartment. The scale had a residue on it that field-tested positive for methamphetamine. Defendant was also found to be in possession of $2,000 in cash, which was not seized at that time.

Officer Brad Mauseth of the Marshalltown Police Department testified that, on June 19, 2015, he responded to an assistance call from another officer who had made a traffic stop of Defendant. Defendant was searched and found to be carrying eight grams of methamphetamine, two grams of marijuana and three cellphones. Laboratory testing confirmed that Defendant was carrying 8.28 grams of methamphetamine, with a purity of 100%. Special Agent Meggers testified that such quantities of methamphetamine are consistent with redistribution.

## H. August 2015 Interdiction in Oklahoma

Officer Thomas Fisher of the Chouteau, Oklahoma Police Department testified that, on August 12, 2015, he initiated a traffic stop of Defendant and subsequently arrested him for driving without a license. During an inventory search of Defendant's vehicle, raw marijuana was found along with dollar bills containing trace amounts of methamphetamine. Approximately one kilogram of methamphetamine was also found in Ziploc bags inside a blue cooler that was on a rear seat. Defendant told Officer Fisher that he believed the substance to be cocaine and that he planned to transport it to Iowa to sell it. Defendant told Officer Fisher that he had found the drugs in a duffel bag at a truck stop in Texas. The bags had been vacuum-sealed but had been cut into previously. Officers also recovered two used methamphetamine field test kits identical to those used by the Chouteau Police Department in the driver's side door. Two cellphones belonging to Defendant were also recovered. Castellanos's name and phone number appeared in one of the cellphones' contacts lists. Laboratory testing later determined that Defendant was transporting 855.3 grams of methamphetamine, with a purity of 100%. Special Agent Meggers testified that the amount of methamphetamine seized was extremely large and was consistent with redistribution.

## IV.  MOTION FOR JUDGMENT OF ACQUITTAL

### A.  Legal Standard

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  Such a motion is permitted after trial, in which case the court may set aside the verdict and enter a judgment of acquittal.  *See* Fed. R. Crim. P. 29(c).  It is well settled that jury verdicts are not lightly overturned.  *See, e.g.*, *United States v. Bassett*, 762 F.3d 681, 684 (8th Cir. 2014); *United States v. Peneaux*, 432 F.3d 882, 890 (8th Cir. 2005).  The court must view the evidence "in the light most favorable to the jury's verdict, accepting all reasonable inferences that support the verdict." *United States v. Walker*, 818 F.3d 416, 419 (8th Cir. 2016) (quoting *United States v. Brown*, 627 F.3d 1068, 1072-73 (8th Cir. 2010)).  The court must uphold the jury's verdict so long as a reasonable-minded jury could have found Defendant guilty beyond a reasonable doubt.  *See id.*  It is not the province of the court to evaluate the credibility of witnesses—that task is for the jury.  *See United States v. Hayes*, 391 F.3d 958, 961 (8th Cir. 2004).

### B.  Analysis

Defendant argues that the court should enter a judgment of acquittal because there was insufficient evidence to support the jury's verdict.  *See* Brief in Support of the Motion ("Brief") (docket no. 437-1) at 5-13.  More specifically, Defendant argues that the evidence was insufficient to prove that Defendant knew of and intentionally joined the conspiracy.  *Id.* at 6.

To convict Defendant of conspiracy to distribute methamphetamine, the government was required to prove beyond a reasonable doubt that: (1) two or more persons reached an agreement or came to an understanding to distribute methamphetamine; (2) Defendant voluntarily and intentionally joined in the agreement or understanding, either at the time

it was first reached or at some later time while it was still in effect and (3) Defendant knew the purpose of the agreement or understanding at the time he joined in the agreement or understanding. *See, e.g.*, Final Jury Instructions (docket no. 408) at 15; *see also United States v. Tillman*, 765 F.3d 831, 833 (8th Cir. 2014). "[T]he fundamental characteristic of a conspiracy is a joint commitment" between two or more persons to commit a crime. *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016). Therefore, a defendant in a conspiracy "must merely reach an agreement" with one other member of the conspiracy, "with the specific intent that the underlying crime be committed by some member of the conspiracy." *Id.* (internal quotation omitted) (formatting omitted). "The government is not required to prove an express agreement." *Tillman*, 765 F.3d at 833 (internal quotations omitted). "Rather, the government need only establish a tacit understanding between the alleged co-conspirators, which may be shown through circumstantial evidence." *Id.* at 833-34 (internal quotations omitted). "[A] defendant may be convicted for even a minor role in a conspiracy, so long as the government proves beyond a reasonable doubt that he or she was a member of the conspiracy." *United States v. Lopez*, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc) (explicitly rejecting the "slight evidence rule"). "[A] defendant's repeated supply of large amounts of [controlled substances] to a [drug] conspiracy is . . . indicative of knowledge and intent to join a conspiracy because of the quantity and regularity of the transactions." *United States v. Rodriguez-Ramos*, 663 F.3d 356, 362 (8th Cir. 2011).

"[I]t is not necessary to proof of a conspiracy that it have a discrete, identifiable organizational structure." *United States v. Slagg*, 651 F.3d 832, 840 (8th Cir. 2011) (alteration omitted) (quoting *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir.1993)); *see also United States v. Baker*, 855 F.2d 1353, 1357 (8th Cir.1988) ("This type of enterprise, by its very nature, is a loosely knit organization."). A jury may find an overall agreement "when 'the participants [in the conspiracy] shared a common aim or purpose

and mutual dependence and assistance existed.'" *United States v. Morales*, 113 F.3d 116, 119 (8th Cir. 1997) (quoting *United States v. Regan*, 940 F.2d 1134, 1135 (8th Cir. 1991)). "Neither the law, nor logic, requires that all of the conspirators know each other or the full extent of the conspiracy's reach." *Id.* (quoting *United States v. Slaughter*, 128 F.3d 623, 630 (8th Cir. 1997). Indeed, even "[d]ealers who compete with one another may be members of the same conspiracy." *Slagg*, 651 F.3d at 842 (alteration in original) (quoting *United States v. Roach*, 164 F.3d 403, 412 (8th Cir. 1998)).

A reasonable jury can infer a single conspiracy even where alleged members of a conspiracy procure drugs from various sources, sell to different customers and compete with one another in multiple groups and in separate acts. *Id.* "That various conspirators join at different times, change roles, or depart from the conspiracy does not convert a single conspiracy into multiple ones." *United States v. Delgado*, 653 F.3d 729, 736 (8th Cir. 2011). A jury may convict a defendant for participating in a drug conspiracy "based solely on the testimony of cooperating witnesses." *Tillman,* 765 F.3d at 834 (internal quotation marks omitted); *see also United States v. Gentry*, 555 F.3d 659, 666 (8th Cir. 2013); *United States v. L.B.G.*, 131 F.3d 1276, 1278 (8th Cir. 1997) ("It is well established that the uncorroborated testimony of a single witness may be sufficient to sustain a conviction." (quoting *United States v. Dodge*, 538 F.2d 770, 783 (8th Cir. 1976))).

Defendant's challenge to the sufficiency of the evidence relates to elements two and three. Brief at 1 ("The [g]overnment failed to establish that Defendant knew of and intentionally joined the hub and spokes wheel conspiracy presented in this case."). Defendant avers that the government provided evidence that he was "involved [in] various methamphetamine[-]related activities on: August 4, 2014; February 7, 2015; April 22, 2015; May 7, 2015; June 29, 2015; and August 12[,] 2015." *Id.* at 4. However, he asserts that "the [g]overnment did not provide evidence relating to other conspirators

during any one of those incidents." *Id.* Defendant and the government disagree over the exact organization of the "hub and spokes wheel conspiracy" that the government analogized to at trial. *Id.* at 10. Defendant does not dispute that one was formed, but rather, disputes whether "the record . . . show[s] that [Defendant] intentionally joined the conspiracy, or agreed to further its ends." *Id.* at 11.

### C. Agreement to Join Conspiracy

Defendant first cites *United States v. Cox*, 942 F.2d 1282, 1284 (8th Cir. 1991) and *United States v. Carper*, 942 F.2d 1298, 1302 (8th Cir. 1991) in support of his argument that the government failed to prove that he agreed to be a member of the conspiracy. In *Cox*, the defendant was convicted of possession with intent to distribute and conspiracy to distribute cocaine. The Eighth Circuit upheld the defendant's possession with intent to distribute conviction because the evidence implicated drug amounts inconsistent with personal use. *Cox*, 942 F.2d at 1285. However, the conspiracy conviction was reversed. The Eighth Circuit found that, because the defendant had been accompanied by unknown persons while stealing drugs and property from others, and because there was no evidence that these unknown persons agreed to take cocaine for distributive purposes, there was insufficient evidence to support the conspiracy conviction. *Id.* at 1286. In *Carper*, the Eighth Circuit held that there was evidence that the defendant and the alleged co-conspirator "associated, but . . . [there was] not enough evidence linking this association to drugs" to sustain the conviction on appeal. *Carper*, 942 F.2d at 1302. This was so even when five telephone calls were made between the defendant and her putative co-conspirator, they were once seen in a restaurant together and the fact that the defendant told a witness that her drug source was "up north," near where the putative co-conspirator lived. *Id.*

The court finds that both *Cox* and *Carper* are distinguishable from the instant action. Here, unlike in *Cox*, Defendant had direct contact with several known and identifiable co-

conspirators. The fact that police did not happen to witness Defendant in the same place as a co-conspirator is of no consequence given the weight of the other evidence adduced at trial, such as testimony given by Defendant's co-conspirators that he was involved in activities in furtherance of the conspiracy. Additionally, unlike in *Carper*, the evidence linked Defendant's association with co-conspirators to methamphetamine distribution. Defendant worked as a driver for Jacket, before assuming a distribution role similar to Jacket's after Jacket's arrest, and dealt methamphetamine supplied by Bote, Jacket's supplier. As a methamphetamine distributor, he sold methamphetamine to his co-conspirator Victor on about ten occasions. The jury could also have reasonably inferred that Defendant and Avalos-Castellanos conspired to distribute methamphetamine based on Ragan Victor's testimony that Defendant "dealt with" Avalos-Castellanos beyond Defendant's purchase of Victor's Pontiac Grand Prix, which Defendant drove to at least one drug transaction. Defendant also agreed to supply Acosta Ceniceros with methamphetamine for distribution, offering to sell her a pound of methamphetamine for $12,000, using her house as a stash house to store methamphetamine and supplied her with a quarter pound of methamphetamine to sell herself. Defendant sold methamphetamine to a confidential informant in a controlled buy, and the same CI bought methamphetamine from co-conspirator Guadarrama, demonstrating the CI's prior drug-buying relationship with both of them. Like Defendant, Guadarrama obtained methamphetamine from Bote, and Defendant had a sufficiently close relationship with Bote that he visited Guadarrama at her home and demanded she pay a debt owed to Bote. Defendant also supplied Guadarrama with several user amounts' worth of methamphetamine, and Guadarrama stated that she knew that Defendant was involved in the drug distribution business. All of these contacts involve identifiable rather than anonymous co-conspirators and connect to the distribution of large quantities of methamphetamine, which is inconsistent with personal use. Defendant's reliance on *Cox* and *Carper* is therefore unpersuasive.

Defendant further argues that, even if the evidence supports a conclusion that Defendant was involved in a conspiracy, "[i]t does not show that he participated in th[e] drug conspiracy charged here." Brief at 9. However, in the light most favorable to the verdict, the evidence showed that Defendant's involvement with the various co-conspirators—namely Ragan, Acosta Ceniceros and Guadarrama—provides evidence that Defendant served as a member of a rotating stable of methamphetamine suppliers, along with Murillo Mora and Becerra. There was evidence that, when street-level dealers like Ragan, Acosta Ceniceros and Guadarrama could not receive methamphetamine from one of these suppliers, they would request it from another, including Defendant. In this way, Defendant was involved in the same conspiracy to distribute methamphetamine as Murillo Mora and Becerra. The fact that he may not have worked hand-in-hand with Murillo Mora or Becerra, and may in fact have competed with them for access to street-level dealers, does not mean that he was not involved in the same conspiracy to distribute methamphetamine. *See Slagg*, 651 F.3d at 842. Further, while a reasonable jury could have found that Defendant conspired with multiple co-conspirators, the government was only required to prove that he conspired with one. *Ocasio*, 136 S. Ct. at 1429.

## D. Knowledge of Conspiracy and of Co-Conspirators

Defendant next asserts that his "lack of knowledge about other conspirators matters." Brief at 10. He argues that he did not know or work with his co-conspirators, and that "[t]he record showed virtually no involvement with any of them." *Id.* As a result, Defendant asserts that he "did not know of or intentionally join this conspiracy." *Id.* At the same time, Defendant concedes that "personal knowledge of, or familiarity with, each co-conspirator is not required to show a conspiracy." *Id.* (quoting *United States v. Barraza Cazares*, 465 F.3d 327, 333 (8th Cir. 2006)). He also cites *Barraza* to argue that knowledge of another co-conspirator is relevant to the issue of a defendant's role or participation in the conspiracy. *Id.* However, while relevant, Defendant's lack of

knowledge of certain co-conspirators is not dispositive. The issue of Defendant's lack of knowledge of certain co-conspirators was repeatedly raised by Defendant's trial counsel during cross-examination of witnesses and via stipulation. The issue was therefore not kept from the jury, and yet the jury still found Defendant guilty. In any event, the evidence directly and/or circumstantially established Defendant's knowledge of numerous co-conspirators. His cellphone number was in Castellanos's contact list, and her phone number was in his contact list. Defendant's phone number contacted Murillo-Mora's phone number on at least nine occasions. Further, Defendant was "friends" with Castellanos on Facebook. This is in addition to his sale and supply of methamphetamine to co-conspirators Victor, Guadarrama and Acosta Ceniceros, whom he also had cellphone contact with. Far from "mere association with members of a criminal conspiracy," *United States v. Graham*, 548 F.2d 1302, 1312 (8th Cir. 1977), this evidence was sufficient to permit a reasonable-minded jury to find beyond a reasonable doubt that Defendant knowingly agreed with various co-conspirators to distribute methamphetamine.[2]

Finally, Defendant claims that his contacts with Acosta Ceniceros do not link him to the charged conspiracy. Brief at 12. Specifically, Defendant argues that his storage of methamphetamine at Acosta Ceniceros' house demonstrates no more than an "overlap in personnel" between Defendant's operation and the charged conspiracy. *Id*. Defendant suggests that, because Acosta Ceniceros was "not acting at the behest of anyone else," her dealings with Defendant were independent of the charged conspiracy. *Id.* However, as discussed above, distributors who compete with one another may simply represent an

---

[2] Defendant's reliance on *United States v. Rosnow* for the proposition that all "spokes" in a "wheel" conspiracy must be aware of each other lacks merit, and in fact undermines his argument, given that *Rosnow* is an IRS case that explicitly distinguishes itself from "the typical drug distribution conspiracy" where "the defendants' knowledge of the existence of remote links . . . may be inferred solely from the nature of the enterprise." *United States v. Rosnow*, 977 F.2d 399, 406 (8th Cir. 1992).

alternative source of supply for the same conspiracy. *See Slagg*, 651 F.3d at 842. Though Murillo Mora and Defendant appeared to have been in competition as sources of supply to the conspiracy—as two separate "spokes"—the jury reasonably found that they were members of the same conspiracy involving a number of the same conspirators, with their activities directed towards accomplishing a single criminal objective, the distribution of methamphetamine. *Id.* The same analysis applies to Defendant and Becerra, who likewise competed to supply methamphetamine. Defendant's repeated supply of large amounts of methamphetamine to known co-conspirators is indicative of his knowledge and intent to join the conspiracy because of the quantity and regularity of the transactions. *See Rodriguez-Ramos*, 663 F.3d at 362.

The evidence was sufficient for a reasonable jury to find, beyond a reasonable doubt: that two or more persons reached an agreement or came to an understanding to distribute methamphetamine, that Defendant voluntarily and intentionally joined in the agreement or understanding and that Defendant knew the purpose of the agreement or understanding at the time he joined in the agreement or understanding.

### E. Summary of Defendant's Activities

Defendant was a member of the charged conspiracy since at least April of 2014, when he first came to the attention of the Marshalltown Police Department. He continued to be a member of the conspiracy at least until his arrest in Oklahoma in August of 2015. In the course of his career as a drug conspirator, Defendant rose from his position as a driver and bodyguard for Jacket and leveraged the contacts Jacket had made to take over his position as a supplier of methamphetamine to the conspiracy. Defendant demanded that Guadarrama repay a debt owed to El Bote, a higher-level supplier who Defendant knew through his time with Jacket. He regularly supplied Guadarrama, Victor and Avalos-Castellanos with methamphetamine. He competed with Murillo Mora and Becerra to be a higher-level supplier and eventually made contact with out-of-state (and perhaps out-of-

country) suppliers such that he was intercepted in Oklahoma transporting drugs that he admitted he intended to distribute in Iowa. He employed Acosta Ceniceros as a street-level dealer after satisfying himself that she was not wired for sound by the government, fronted her an ounce at first, and supplied her with at least two pounds of methamphetamine in total for distribution. Finally, Defendant directed the distribution of at least eight pounds of methamphetamine, two pounds of which was warehoused for a time in Acosta Ceniceros's garage before it hit the streets in the care of two unidentified employees of Defendant. The evidence makes plain that, during the relevant timeframe, Defendant was an active member of the charged conspiracy and had direct contact with multiple co-conspirators and worked to climb the drug distribution ladder in the Marshalltown, Iowa area before his eventual arrest. Accordingly, the Motion is denied to the extent that it seeks a judgment of acquittal.

## V. MOTION FOR NEW TRIAL

### A. Legal Standard

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court is granted broad discretion in considering a motion for a new trial. *See United States v. Peters*, 462 F.3d 953, 957 (8th Cir. 2006). A district court may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict . . . ." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002) (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)). However, the court "should grant a new trial only if 'the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.'" *Peters*, 462 F.3d at 957 (quoting *United States v. Rodriguez*, 812 F.2d 414, 417 (8th Cir. 1987)).

A district court enjoys more latitude in granting new trials under Rule 33 than in granting motions for judgment of acquittal under Rule 29; however, "[m]otions for new trials based on the weight of the evidence are generally disfavored." *Campos*, 306 F.3d at 579. District courts "must exercise the Rule 33 authority 'sparingly and with caution.'" *Id.* (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). The court's standard of review for a motion for new trial differs from the standard that is applied to a motion for judgment of acquittal.

> When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal. The question is not whether the defendant should be acquitted outright, but only whether he should have a new trial. The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*Lincoln*, 630 F.2d at 1319; *see also United States v. Johnson*, 474 F.3d 1044, 1050-51 (8th Cir. 2007) (reiterating applicable standard).

## B. Analysis

Defendant provides no additional argument for why the court should grant a new trial, but instead relies on the sufficiency-of-the-evidence argument addressed above. *See* Brief at 14. The court has concluded that the government presented sufficient evidence at trial, and further concludes that the evidence did not "preponderate[] sufficiently heavily against the verdict" to warrant a new trial. *Lincoln*, 630 F.2d at 1319. No miscarriage of justice occurred. Accordingly, the court shall deny the Motion to the extent it seeks a new trial.

## VI. CONCLUSION

In light of the foregoing, the Motion (docket no. 437) is **DENIED**.

**IT IS SO ORDERED.**

**DATED** this 10th day of November, 2016.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA